**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| JENNIFER PATTERSON,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION,<br><br>Defendant. | CASE NO. 1:25-CV-01536-AMK<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**MEMORANDUM OPINION AND ORDER** |

Plaintiff Jennifer Patterson seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF Doc. 6.)

For the reasons set forth below, the Court **AFFIRMS** the Commissioner's final decision.

## I. Procedural History

Ms. Patterson filed her SSI application on November 18, 2020, alleging an onset date of January 1, 2012.[1] (Tr. 90.) She alleged disability due to chronic asthma, fibromyalgia, chronic urticaria, rhinitis, diverticulosis, chronic constipation, inability to urinate properly, frequent nausea, anxiety, painful swelling, loss of focus, concentration, and memory, post-traumatic stress disorder ("PTSD"), panic attack and anxiety disorder, paroxysmal, severe pain and bleeding during menstrual cycle, severe allergies, and persistent severe bronchospasm cough. (Tr. 91,

[1] The current SSI benefits period begins on November 18, 2020, the date the instant application was filed. (Tr. 643.)

100.) Her application was denied initially and upon reconsideration (Tr. 90, 99), and she requested a hearing (Tr. 140). An Administrative Law Judge ("ALJ") held a hearing (Tr. 36-70) and issued a decision denying the application on January 11, 2022 (Tr. 21-30). On February 13, 2023, the Appeals Council denied Ms. Patterson's request to review the ALJ decision (Tr. 1-6), prompting her to file a Complaint in this Court (Tr. 714). The case was remanded to the Commissioner by stipulation of the parties on September 22, 2023. (*Id.*)

On remand, the Appeals Council vacated the ALJ's January 2022 decision and remanded the case to the ALJ for further administrative proceedings. (Tr. 730-31.) The Appeals Council also instructed the ALJ to consolidate the current claim with Plaintiff's duplicative SSI application filed on March 21, 2023.[2] (Tr. 731; *see* Tr. 701-13, 716-27.)

On April 2, 2024, the ALJ issued another unfavorable decision without conducting a new hearing. (Tr. 738-59.) Ms. Patterson filed Exceptions to Final Decision with the Appeals Council on April 6, 2024 (Tr. 801-04), and the Appeals Council assumed jurisdiction of the case finding that the ALJ's April 2 decision did not comply with its prior order (Tr. 762-73). In a decision dated May 21, 2024, the Appeals Council remanded the case instructing that a new ALJ be assigned the case, that the ALJ offer Ms. Patterson the opportunity for a hearing, and that the ALJ "[g]ive further consideration to the claimant's maximum RFC capacity during the entire period at issue." (Tr. 763.)

On March 17, 2025, a new ALJ held another hearing. (Tr. 655-75.) The ALJ issued an unfavorable decision on April 8, 2025, finding that Ms. Patterson had not been under a disability since November 18, 2020, the date her application was filed. (Tr. 619-43.) Ms. Patterson again

[2] In this application, Ms. Patterson alleged disability due to PTSD, anxiety, depression, chronic asthma, fibroids, urinary retention, PMJ, fibromyalgia, chronic allergies, paroxysmal, chronic constipation, chronic urticaria, heavy breathing, psycicaria, high blood pressure, sleep disturbances, and diverticulosis. (Tr. 701, 717.)

filed Exceptions to Final Decision (Tr. 914-15), but the Appeals Council declined to assume jurisdiction (Tr. 612), making the April 8, 2025 decision the final decision of the Commissioner.

Ms. Patterson filed the instant Complaint on July 24, 2025 (ECF Doc. 1), and the matter is fully briefed (ECF Docs. 9-1, 10). She identifies two assignments of error:

(1) Whether the ALJ erred when she found that the claimant did not have any severe neurological or psychotic spectrum impairments.

(2) Whether the ALJ erred when she discounted all of the medical opinions from the claimant's treating providers, as well as medical opinions issued by consultative examiners.

(ECF Doc. 9-1, p. 1.)

## II. Evidence

### A. Personal, Educational, and Vocational Evidence

Ms. Patterson was born in 1985 and was 36 years old on the alleged disability onset date, making her a younger individual under Social Security regulations. (Tr. 701.) She had at least a high school education. (Tr. 238, 956.) Ms. Patterson has not worked since January 1, 2012, the alleged onset date. (Tr. 91.)

### B. Medical Evidence[3]

#### 1. Physical Treatment History

On November 27, 2020, Ms. Patterson presented to her primary care physician ("PCP") Cherrica Davis, M.D., at Lake Health Physician Group. (Tr. 472-75.) She reported lower back pain radiating into her left leg, which had caused her fall despite using a cane, and which was relieved by rest and naproxen. (Tr. 473.) On physical examination, Ms. Patterson appeared pleasant and well groomed, with no spinous tenderness, no gross musculoskeletal abnormalities,

[3] The summary of the medical evidence is not exhaustive and is generally limited to evidence cited by the parties that is from the alleged disability period and relevant to the legal and factual issues before the Court.

full orientation, grossly intact cranial nerves, and otherwise grossly normal neurological function. (Tr. 473-74.) She used a cane for ambulation. (Tr. 474.) Dr. Davis assessed low back pain, asthma, and hypertension. (*Id.*) She continued naproxen to treat back pain and ordered an x-ray of the lumbosacral spine. (*Id.*) The x-ray was conducted that same day and showed spondylosis of the spine but no fracture or spondylolisthesis. (Tr. 449 (dup. at Tr. 456).)

Ms. Patterson followed up with Dr. Davis on December 23, 2020. (Tr. 469-71.) She reported body aches and pain that was 7/10 but denied concerns about her physical or mental ability and denied difficulty performing activities of daily living ("ADL's"). (Tr. 469.) On examination, she was in no acute distress and displayed grossly intact cranial nerves. (Tr. 470.) Her medications were unchanged, and a follow-up was set for one year. (Tr. 471.)

On March 25, 2021, Ms. Patterson returned to Dr. Davis regarding her hypertension. (Tr. 540-42.) She did not report any pain. (Tr. 540.) On examination, she was in no acute distress, displayed no musculoskeletal abnormalities, and was neurologically grossly intact. (Tr. 540-41.)

On March 17, 2022, Ms. Patterson presented at the Cleveland Clinic emergency room ("ER") with lightheadedness and dizziness. (Tr. 1922.) She reported that she sometimes felt this way, but that her blood pressure was also a bit low. (*Id.*) On examination, her pulse was abnormal, but she had normal blood pressure, regular heart rate and rhythm, normal pulmonary effort, normal range of motion, no focal deficit, and full orientation. (Tr. 1923-24.) She was mildly tachycardic, but a CT of the brain was normal, and she ambulated without difficulty. (Tr. 1924-25.) She was discharged as stable. (Tr. 1925.)

Ms. Patterson attended an appointment with Dr. Davis on November 17, 2022. (Tr. 1149-52.) She reported jaw pain, cough, congestion, and vomiting but denied falling or difficulty walking. (Tr. 1149.) She sought further evaluation after recently going to the ER with

chest discomfort, dizziness, and palpitations, but she reported that all of her testing had been normal. (*Id.*) Her physical examination showed grossly normal neurological findings. (Tr. 1150.) In addition to her ongoing diagnoses, Dr. Davis assessed temporomandibular joint disorder ("TJD") and increased a prescription for gabapentin to address the resulting pain. (*Id.*) She also referred Ms. Patterson to cardiology for an evaluation. (Tr. 1150-51.)

Ms. Patterson followed up with Dr. Davis for medication management related to jaw pain on February 17, 2023. (Tr. 1174-75.) She declined to talk to Dr. Davis about a recent mental health episode, she denied difficulty walking, and she denied difficulty performing ADLs. (*Id.*) Dr. Davis assessed sialadenitis and prescribed clindamycin HCL. (Tr. 1175.)

Ms. Patterson attended a follow up at Cleveland Clinic Allergy with Ronald Purcell, M.D., on June 22, 2023. (Tr. 1268-72.) She reported a nearly daily, burning, itching sensation on her skin with a rash. (Tr. 1270.) She had been unable to identify a specific trigger, and antihistamines had not affected her symptoms, but taking hydroxyzine 25 mg nightly helped some, as had past courses of high-dose systemic corticosteroids. (*Id.*) A physical examination was normal throughout, including full orientation, no rashes, and normal gait. (Tr. 1271-72.) Dr. Purcell noted that Ms. Patterson's symptoms were not likely caused by allergies since antihistamines were not helping, and he suspected a neuropathic process such as small fiber neuropathy. (Tr. 1272.) He started a trial of cetirizine, continued hydroxyzine and gabapentin, and referred Ms. Patterson to neurology. (*Id.*)

On July 11, 2023, Ms. Patterson attended a new patient appointment with Sarah J. Hrestak APRN, CNP, at Cleveland Clinic Neurology. (Tr. 1245-52.) She reported paresthesia that affected most of her body in the form of a painful, burning itching sensation on her skin, sometimes with raised bumps and occasionally accompanied by a fever. (Tr. 1245.) She said

Atarax helped but did not eliminate these symptoms, and she had treated with high-dose antihistamines, moisturizers, and topical corticosteroids. (*Id.*) She also reported fatigue, generalized weakness, occasional postural dizziness, excessive sweating, and stiffness in her neck and back. (Tr. 1245-46.) Upon neurological examination, she displayed full orientation, intact cranial nerves and sensation, diminished reflexes, off-balance tandem walk, positive Romberg's test with sway to the left, and normal speech, comprehension, tone, bulk, strength, movement, coordination, and stride. (Tr. 1248-49.) CNP Hrestak diagnosed paresthesia of the skin and demyelinating disease of the central nervous system. (Tr. 1251.) She continued gabapentin and Atarax, ordered labs and an MRI of the brain and cervical spine, and sent Ms. Patterson for an autonomic TILT test to rule out dysautonomia. (*Id.*)

Ms. Patterson was scheduled for an MRI of the brain and cervical spine on August 8, 2023 (Tr. 1862-74) based on a suspected diagnosis of demyelinating disease of the central nervous system/multiple sclerosis ("MS") (Tr. 1864). But the record does not contain imaging results, and the MRI appears to have been cancelled. (Tr. 1338, 1862-74.)

On October 2, 2023, Ms. Patterson presented to Stephanie Ribelli, D.O., at Cleveland Clinic Rheumatology for evaluation of a possible autoimmune disease. (Tr. 1414-21 (dup. at 1330-35).) She reported constant aching pain all over that increased with activity and interfered with ADL's, as well as joint stiffness and swelling, frequent headaches, pins and needles sensation, and numbness. (Tr. 1414-15.) Gabapentin helped but did not eliminate her pain. (Tr. 1414.) Upon physical examination, Ms. Patterson was in no acute distress, used a cane, had diffuse severe myofascial tenderness, and displayed normal reflexes, no focal deficits, and full range of motion throughout. (Tr. 1419.) Dr. Ribelli assessed fibromyalgia, urticaria, joint pain, and high BMI. (Tr. 1420.) She recommended treating with optimal sleep, regular aerobic

exercise, mental health treatment, and relaxation techniques such as yoga. (*Id.*) She noted that Ms. Patterson was resistant to these recommendations and expressed concerns about an autoimmune disease. (Tr. 1420-21.) Dr. Ribelli explained that rheumatologic work ups had been unremarkable and suggested she follow up with her PCP for medication management. (*Id.*)

On November 4, 2023, Ms. Patterson presented at Premier Urgent Care complaining of low back pain radiating down the right side that was 10/10 and had prevented her from walking for three days. (Tr. 1657.) She came to urgent care walking with a cane and had used gabapentin, naproxen, and lidocaine patches at home with some improvement. (*Id.*) A physical examination showed full strength throughout, normal cognitive function, normal back range of motion, and no musculoskeletal tenderness. (Tr. 1659.) Ms. Patterson was given a Toradol shot and prescribed prednisone and cyclobenzaprine. (Tr. 1659-60.)

On November 9, 2023, Ms. Patterson attended her annual exam with Dr. Davis. (Tr. 1435-40.) She reported her recent urgent care visit and continued to endorse back pain. (Tr. 1435.) Her physical examination showed tenderness and decreased range of motion in the lumbar back, no acute distress, no focal deficits, and full orientation. (Tr. 1438-39.) Dr. Davis assessed chronic low back pain and referred Ms. Patterson to Connor Whole Health for fibromyalgia treatment. (Tr. 1439.)

On December 7, 2023, Ms. Patterson attended a new patient appointment with Khalil A. Al-Amin, M.D., at University Hospitals for treatment of generalized pain. (Tr. 1453-60.) She reported chronic right lower back pain that radiated down the right lower extremity in the posterior lateral aspect that was worse with standing and walking and better with sitting. (Tr. 1457.) She denied numbness or tingling. (*Id.*) Her physical examination showed no acute distress, tenderness to palpation in 8/11 points in the musculature, no focal deficit, no tenderness

of the lumbar spine, normal range of motion of the lumbar spine, full strength in the extremities, no sensory abnormalities, 2+ reflexes in the extremities, and positive straight leg test on the right, negative on the left. (Tr. 1458-59.) Dr. Al-Amin diagnosed chronic bilateral low back pain with sciatica, neurogenic claudication due to lumbar spinal stenosis, and fibromyalgia. (Tr. 1459.) He referred Ms. Patterson to pain medicine and water therapy, ordered an epidural steroid injection, continued gabapentin for pain, and noted an upcoming lumbar MRI. (Tr. 1460.)

Ms. Patterson attended a chiropractic appointment at University Hospitals on February 23, 2024 with Joseph E. Bellissimo, D.C. (Tr. 1498-1503.) She reported her low back pain episodes had been increasing in frequency and length and could be accompanied by numbness, tingling, and pain down the right leg with prolonged walking or standing. (Tr. 1501.) Heat, ibuprofen, and lidocaine patches had helped, but not recently. (*Id.*) On physical examination, she was in no acute distress, she had tenderness in the thoracic and lumbar spine and decreased range of motion in the lumbar spine, and she displayed full orientation, no focal deficit, normal cranial nerves, and intact sensation, motor function, and coordination. (Tr. 1502.) D.C. Bellissimo noted her diagnosis as "segmental and somatic dysfunction" of the lumbar, thoracic, sacral, and cervical regions and "lumbosacral radiculitis." (Tr. 1498-99.)

Ms. Patterson returned for chiropractic treatment with D.C. Bellissimo intermittently throughout 2024. (*See, e.g.,* Tr. 2151, 2154, 2156-57.) She continued to demonstrate tenderness in the thoracic spine and tenderness and decreased range of motion in the lumbar spine, as well as full orientation, intact sensation, and normal motor function and coordination. (*See* Tr. 2152, 2155, 2158, 2164, 2167.) She reported improved symptoms at some of these visits (Tr. 2157, 2163, 2166) but flareups at others (Tr. 2160).

On May 15, 2024, Ms. Patterson saw Dr. Davis to request home health care services because it was taxing for her to perform some ADL's. (Tr. 1736.) A physical examination was normal throughout. (*Id.*) Dr. Davis referred Ms. Patterson to home health care for fibromyalgia, neurogenic claudication due to lumbar spinal stenosis, and periarthritis. (Tr. 1737.)

On October 28, 2024, Ms. Patterson followed up with CNP Hrestak regarding her July 2023 office visit. (Tr. 2088-95.) She continued to report paresthesia of the skin, rashes, and burning, itching, and deep pain all over her body that improved when she was not anxious. (Tr. 2088.) CNP Hrestek noted that an MRI was "unremarkable and did not show a lesion that would be responsible for [Ms. Patterson's] subjective complaints." (*Id.*)[4] She assessed paresthesia of the skin and fibromyalgia and recommended a skin biopsy to rule out small fiber neuropathy. (*Id.*) A neurological examination showed appropriate communication and normal cranial nerves, coordination, and gait. (Tr. 2092.)

At other appointments during the relevant period, Ms. Patterson regularly exhibited full strength, intact sensation, no focal deficits, and/or normal gait, motor activity, and coordination. (*See, e.g.,* Tr. 1114, 1128, 1134, 1222, 1248-49, 1338.)

**2. Mental Health Treatment History**

On February 25, 2021, Ms. Patterson underwent a consultative psychological evaluation, with Stephen Billmann, Psy.D. (Tr. 525-30.) Her mental status examination showed: cooperative and adequately motivated behavior; clear and understandable speech; logical, coherent, and somewhat circumstantial thoughts; good eye contact; no suicidal or homicidal ideation; no indications of obsessions, compulsions, paranoid ideation, delusions, or hallucinations; full orientation and responsiveness; sufficient judgment; limited insight; and

[4] As noted previously, an MRI scheduled for August 2023 appears to have been cancelled. (Tr. 1338.) The results of the MRI described by CNP Hrestak do not appear in this record. (*See* Tr. 2093.)

adequate immediate, working, and short-term memory. (Tr. 528.) She was highly focused on her physical complaints, she knew basic facts, and she could interpret a simple idiom. (*Id.*)

On January 24, 2023, Ms. Patterson underwent a crisis assessment at Frontline Services with Meaghan Clemons, LSW, PS4 Crisis Intervention Specialist. (Tr. 1098-1111.) She had called Frontline the previous day "overwhelmed with [suicidal ideations], interpersonal conflicts and needing [mental health] support." (Tr. 1098.) During her assessment, she denied current suicidal ideations and delusions, but she reported depressed mood, diminished ability to think or concentrate, fatigue, sleep disturbance, panic attacks, self-harm, impulsive shopping, paranoia, auditory and visual hallucinations, feelings of guilt and worthlessness, and difficulty trusting other people. (Tr. 1098-1100, 1102.) Regarding hallucinations, she clarified that she had "dreams, premonitions, and psychic abilities" on occasion, but was unsure if she would call them hallucinations. (Tr. 1099.) She further explained that she believed she had experienced a hallucination "one or two times in the past," but they did not come often, and she related them to being tired. (*Id.*) Ms. Patterson reported that citalopram had worked for her, but she had not been compliant over the last month. (Tr. 1102.) On mental status examination, she was fully oriented, she spoke logically and responsively, and she displayed anxious, depressed, suspicious, and dysphoric mood, normal affect, normal reasoning and judgment, and difficulty remembering dates and time frames of past events. (Tr. 1104-05.) LSW Clemons offered to help Ms. Patterson link to long-term mental health care. (Tr. 1107.)

On February 8, 2024, Ms. Patterson underwent a psychiatric assessment at Frontline with Maura Fibbi, CNP. (Tr. 1215-29.) She reported anxiety, dysphoria, panic attacks, worrying about everything, exposure to one or more traumatic events, auditory hallucinations, and grandiose, bizarre, persecutory delusions, such as believing she had paranormal gifts and abilities

and could read minds. (Tr. 1216-18.) She also reported feeling like others blamed her and "love[d] to get upset at [her] over nothing or falsely accuse [her] of things." (Tr. 1216.) She said citalopram helped, and she did not want to take additional medication. (Tr. 1219.) Her examination showed: normal speech; engaged attitude; constricted affect; black and white thinking; overvalued ideas; tangential thought processes; full orientation; normal fund of knowledge; partial insight; mildly impaired judgment; no apparent internal stimulation; and paranoid, bizarre, and persecutory delusions. (Tr. 1221-24.) She denied suicidal ideation in the past month. (Tr. 1224.) CNP Fibbi diagnosed unspecified schizophrenia spectrum and other psychotic disorder, generalized anxiety disorder ("GAD"), and major depressive disorder ("MDD"). (Tr. 1227.) She did not prescribe any new medications, continuing Ms. Patterson on citalopram as managed by her PCP, and planned to assist her in linking to outside psychiatric and psychotherapy services. (Tr. 1229.)

On March 10, 2023, Ms. Patterson attended a pharmacology management appointment at Frontline with CNP Fibbi. (Tr. 1112-18 (dup. at 1207-14).) She reported that her anxiety levels had been "about the same" since her last appointment, and she became more anxious around other people than she did alone. (Tr. 1113.) She also reported psychic abilities that she thought contributed to her anxiety. (*Id.*) Her mental status examination showed appropriate grooming and eye contact, normal speech, engaged attitude, "lackluster" mood, constricted affect, vague and tangential thought processes, full orientation, normal fund of knowledge, partial insight, and mildly impaired judgment. (Tr. 1114-16.) She did not appear to be internally stimulated and exhibited paranoid, persecutory, grandiose, and bizarre delusions. (Tr. 1115.) She did not report suicidal ideation within the last 30 days. (Tr. 1116.) CNP Fibbi prescribed Abilify 5mg for

psychosis, continued citalopram as managed by Ms. Patterson's PCP, and recommended seeking outside psychiatric and psychotherapy services. (Tr. 1117.)

On December 13, 2023, Ms. Patterson underwent a consultative psychological examination with Carolyn Arnold, Psy.D. (Tr. 1482-86.) She reported symptoms including sadness, crying spells, shaking, anxiety, fatigue, and sleep disturbance. (Tr. 1483.) She denied delusions, hallucinations, or homicidal ideation but admitted to past suicidal thoughts. (Tr. 1484.) Her mental status examination showed: good hygiene and grooming; cooperative behavior; self-reported slow and uninterested mood with congruent affect; normal speech; and full orientation. (*Id.*) She could: remember past events; recall three of three words immediately and recall one of three words after a few minutes; and accurately recall four of six digits forward and two of six digits backwards. (*Id.*) She identified a current event, incorrectly named the current governor, and correctly named the current president and two of five states bordering Ohio. (*Id.*) She could not calculate serial 7's from 100, she correctly spelled "world" backwards and forwards, she followed a three-step command, and she understood all instructions given. (*Id.*) Her abstract thinking was intact, her insight realistic, and her judgment good. (Tr. 1484-85.) Dr. Arnold diagnosed GAD, MDD, and PTSD. (Tr. 1485.)

On January 17, 2025, Ms. Patterson attended intake appointments at Signature Health. (Tr. 2184-98.) At an integrated assessment with Emily Adkins, APN, she sought counseling for depression, anxiety, and PTSD. (Tr. 2184, 2186.) She reported agitation and irritability, decreased concentration, occasional auditory and visual hallucinations at night, and sleep disturbance. (Tr. 2186.) Her mental status examination showed full orientation and normal behavior (Tr. 2185), but she scored "21 – severe" on a depression screening (Tr. 2188), and APN

Adkins noted she was nervous/anxious (Tr. 2186). APN Adkins diagnosed severe episodic MDD with psychotic features and planned to establish counseling. (Tr. 2184.)

That same date, Ms. Patterson underwent a psychiatric diagnostic evaluation with Audra Kirchmeir, LSW at Signature Health. (Tr. 2191-98.) She reported symptoms of sadness, guilt, hopelessness, thoughts of death, low self-esteem, irritability, nervousness, hypervigilance, sleep problems, racing thoughts, hallucinations, delusions, restlessness, flashbacks, nightmares, and exaggerated startle response. (Tr. 2195.) On mental status examination, she displayed full orientation, neutral mood, full affect, unremarkable thought processes, cooperative attitude, appropriate insight, and fair judgment. (Tr. 2196.) She was calm and cooperative and responded appropriately to questions. (Tr. 2192.) LSW Kirchmeir referred Ms. Patterson to Specialty Mental Health for outpatient counseling. (Tr. 2198.)

Ms. Patterson attended an initial psychotherapy appointment on February 12, 2025, with Synita Brazil, LPC at Signature Health. (Tr. 2181-84.) She explained how past traumatic events contributed to her current mental health problems. (Tr. 2182.) Her mental status examination was "within normal limits." (Tr. 2182.) LPC Brazil scheduled another appointment for February 19. (Tr. 2183.) The record contains no evidence that Ms. Patterson attended further counseling or psychiatry appointments.

Upon mental status examination at physical health appointments in the record, Ms. Patterson displayed full orientation, cooperative attitude and behavior, pleasant or normal mood, and/or normal attention, speech, comprehension, reasoning, and judgment. (*See, e.g.,* Tr. 473 (11/27/2020), 540 (3/25/2021), 1150 (11/17/2022), 1334 (10/2/2023), 1439 (11/9/2023), 1459 (12/7/2023), 2164 (4/19/2024), 2167 (3/15/2024).)

### 3. Opinion Evidence

#### i. Treating Sources

On June 14, 2021, Dr. Davis conducted a physical Residual Functional Capacity ("RFC") assessment of Ms. Patterson and completed a Medical Source Statement ("MSS"). (Tr. 589-98.) On the physical RFC assessment form, she opined that Ms. Patterson could: lift/carry ten pounds occasionally; stand/walk less than two hours and sit less than six hours in an eight-hour workday; occasionally push or pull 24.5 pounds with the upper and lower extremities; occasionally stoop and climb ramps or stairs; and never balance, kneel, crouch, crawl, or climb ladders, ropes, or scaffolds. (Tr. 590-91.) She indicated that Ms. Patterson was "limited" in handling, fingering, and reaching in all directions. (Tr. 592.) She further opined that Ms. Patterson should avoid all exposure to hazards and concentrated exposure to extreme cold and heat, wetness, humidity, noise, fumes, odors, dust, gases, and poor ventilation. (Tr. 593.) On the MSS, Dr. Davis opined that Ms. Patterson could: occasionally lift/carry ten pounds and frequently lift zero pounds; stand zero hours and sit four to five hours in an eight-hour workday; rarely stoop, crouch, kneel, and crawl; occasionally climb, balance, reach, push, pull, and manipulate; and should avoid exposure to heights, moving machinery, extreme temperatures, pulmonary irritants, and noise. (Tr. 597-98.) She further opined that Ms. Patterson would need to alternate between sitting and standing at-will and would require three hours of additional breaks in an eight-hour workday. (Tr. 598.)

On December 5, 2024, Dr. Davis completed a second MSS. (Tr. 2133-34.) She opined that Ms. Patterson could: occasionally lift ten pounds and frequently lift zero pounds; stand for zero hours and sit for four to five hours in an eight-hour workday; rarely stoop, crouch, kneel, and crawl; occasionally climb, balance, reach, push, pull and manipulate; and should avoid heights, moving machinery, extreme temperatures, pulmonary irritants, and noise. (Tr. 2133-34.)

She further opined that Ms. Patterson required a sit/stand at will option and would require three hours additional unscheduled rest periods during an eight-hour workday. (Tr. 2134.)

**ii. Consultative Examiners**

**a. Dr. Billman**

On February 25, 2021, consultative examiner Dr. Billman examined Ms. Patterson and diagnosed her with PTSD, Unspecified Personality Disorder with Dependent and Borderline Features, and Unspecified Depressive Disorder with Anxious Distress. (Tr. 529.) Dr. Billman opined that Ms. Patterson: was not limited in her ability to understand, remember, and carryout instructions; "may have some difficulties" maintaining attention, concentration, persistence, and pace to perform simple and multistep tasks; had "significant limitations" in her ability to respond appropriately to coworkers and supervisors in a work setting; and was "likely to have significant limitations" responding appropriately to work pressures in a work setting. (Tr. 529-30.)

**b. Dr. Arnold**

On December 13, 2023, consultative examiner Dr. Arnold examined Ms. Patterson and diagnosed her with GAD, MDD, and PTSD. (Tr. 1485.) Dr. Arnold opined that: Ms. Patterson was able to understand, remember, and carry out instructions, but her short and long-term memory were "less intact"; she could sustain concentration and show persistence with simple and multistep tasks for a short period of time; and she had a "reduced tolerance for being around people." (Tr. 1485-86.)

**iii. State Agency Consultants**

**a. 2020 Application**

On January 21, 2021, state agency medical consultant, W. Scott Bolz, M.D., conducted a physical RFC assessment. (Tr. 95-96.) Dr. Bolz opined that Ms. Patterson could: occasionally

lift/carry 20 pounds and frequently lift/carry 10 pounds; stand/walk about six hours and sit about six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally crawl and climb ramps or stairs; and frequently balance, stoop, kneel, and crouch. (*Id.*) On July 7, 2021, Mehr Siddiqui, M.D., affirmed Dr. Bolz's findings on reconsideration. (Tr. 105-06.)

On March 5, 2021, state agency psychological consultant, Akanksha Dutt, Psy.D., conducted a mental RFC assessment. (Tr. 96-97.) Dr. Dutt opined that Ms. Patterson could: complete tasks that entail simple and concrete instructions and entail short cycles of time; complete tasks without a sustained production pace or stringent daily quota; and adapt and manage herself in a structured and predictable work setting where major changes are explained, and she is given time to adjust to new expectations. (Tr. 97.) On June 17, 2021, Aracelis Rivera, Psy.D., affirmed Dr. Dutt's findings on reconsideration. (Tr. 106-07.)

**b. 2023 Application**

On September 5, 2023, state agency medical consultant Gary Hinzman, M.D., conducted a physical RFC assessment. (Tr. 708-09.) Dr. Hinzman opined that Ms. Patterson could: occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds; stand/walk about six hours and sit about six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; frequently balance, stoop, and climb ramps or stairs; and occasionally kneel, crouch, and crawl. (Tr. 708.) He further opined that she should avoid concentrated exposure unprotected heights and fumes, odors, dusts, etc. (Tr. 709.) On December 27, 2023, Lynne Torello, M.D., affirmed Dr. Hinzman's findings on reconsideration. (Tr. 723-24.)

On September 1, 2023, state agency psychological consultant, Kevin Lauer, Ph.D., conducted a mental RFC assessment. (Tr. 710-11.) He opined that Ms. Patterson could: complete simple, short cycle tasks that do not require prolonged periods of focus and

concentration or strict production demands with supervisory support when first learning job tasks, in a relatively isolated setting away from the distractions of others; work in a setting that does not involve public interaction and involves brief and superficial interaction with supervisors and coworkers that does not require resolving conflicts; and adapt to a structured and predictable work setting with occasional changes in responsibilities and expectations where changes could be explained in advance. (*Id.*) On January 2, 2024, Janet Souder, Psy.D., affirmed Dr. Lauer's mental RFC determination on reconsideration. (Tr. 725-26.)

### C. Hearing Testimony

Ms. Patterson testified in response to questions from an ALJ and her attorney at hearings on December 17, 2021, and March 17, 2025. (Tr. 42-63, 661-69.) A Vocational Expert ("VE") also testified at each hearing. (Tr. 63-70, 669-74.)

At the December 17, 2021 hearing, it was established that Ms. Patterson has no past work. (Tr. 47, 660-61.) At the March 17, 2025 hearing, the VE testified that a hypothetical individual of Plaintiff's age, education, and work experience, with the functional limitations described in the ALJ's RFC determination, could perform representative positions in the national economy, including hotel housekeeper, merchandise marker, and routing clerk. (Tr. 670.) He also testified that it would preclude competitive employment if the person would be off task more than 10% of the time or consistently absent more than one day a month. (Tr. 674.)

## III. Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform other work available in the national economy. *Id.*

## IV. Law & Analysis

### A. Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakely*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)) (alteration in original). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a court cannot overturn the

Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

### B. First Assignment of Error: The ALJ Did Not Commit Harmful Error by When She Failed to Designate a "Severe" Neurological or Psychotic Impairment

In her first assignment of error, Ms. Patterson argues that the ALJ erred when she failed to identify a psychotic disorder and a neurological disorder as severe impairments, and when she failed to include related limitations in the RFC. (ECF Doc. 9-1, pp. 16-21.) The Commissioner argues in response that any failure to find a neurological or psychotic impairment "severe" is not reversible error because the ALJ found other impairments severe and considered all impairments and relevant symptoms when developing the RFC. (ECF Doc. 10, pp. 7-9.)

#### 1. Legal Standard for Step Two Determinations

At Step Two of the sequential analysis, the claimant bears the burden to show "a severe medically determinable physical or mental impairment" or combination of impairments that meet specified duration requirements. 20 C.F.R. § 416.920(a)(4)(ii). A medically determinable impairment ("MDI") is an impairment that results from "anatomical, physiological, or

psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 416.921. Under the applicable regulations, an MDI may only be "established by objective medical evidence from an acceptable medical source," and not by a "statement of symptoms, a diagnosis, or a medical opinion" alone. *Id.*

Once an MDI has been established, the analysis turns to whether it is "severe." 20 C.F.R. § 416.921. The claimant bears the burden of showing the severity of her impairments. *Foster v. Sec'y of Health & Hum. Servs.,* 899 F.2d 1221, at *2 (6th Cir. 1990) (unpublished table decision) (citing *Murphy v. Sec'y of Health & Hum. Servs.*, 801 F.2d 182, 185 (6th Cir. 1986)). A "severe" impairment is defined under the regulations as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities." *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 428 (6th Cir. 2007) (quoting 20 C.F.R. § 404.1520(c)); *see also Long v. Apfel*, 1 F. App'x 326, 330-32 (6th Cir. 2001).

The Sixth Circuit has explained that an ALJ's failure to designate an impairment as severe is "'legally irrelevant'" when "other impairments are found to be severe." *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 852 (6th Cir. 2020) (quoting *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008)). This is because an "erroneous finding of nonseverity at step two is . . . harmless where the ALJ properly considers nonsevere impairments at later steps." *Id*. (citing *Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240 (6th Cir. 1987)); *see also Kestel v. Comm'r of Soc. Sec.*, 756 F. App'x 593, 597 (6th Cir. 2018) ("because an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, any perceived failure to 'find additional severe impairments at step two "[does] not constitute reversible error."'") (quoting *Fisk v. Astrue*, 253 F. App'x 580, 583 (6th Cir. 2007) and *Maziarz*, 837 F.2d at 244) (alteration in original); *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir.

2003) (finding it "of little consequence," when an impairment was found to be severe, whether other impairments were deemed severe or non-severe).

In contrast, the Sixth Circuit has found reversible error when an ALJ explicitly did not consider a non-severe impairment in assessing the RFC at Step Four. *See Simpson v. Comm'r of Soc. Sec.,* 344 F. App'x 181, 190-91 (6th Cir. 2009) (distinguishing *Maziarz* and finding reversible error when an ALJ found a non-severe mental impairment "would not be considered in assessing her RFC"); *cf. Pompa,* 73 F. App'x at 803 (finding harmless error where the "ALJ considered all of [plaintiff]'s impairments in her residual functional capacity assessment").

More recently, in *Napier v. Comm'r of Soc. Sec.*, 127 F.4th 1000 (6th Cir. 2025), the Sixth Circuit considered a challenge to an ALJ's Step Two findings without applying a harmless error analysis. Instead, the *Napier* court applied a substantial evidence analysis in assessing whether the ALJ erred in finding mental impairments non-severe at Step Two, or by failing to incorporate mental limitations into the RFC at Step Four. *Id.*

Plaintiff challenges the ALJ's failure to designate both a neurological disorder and a psychotic disorder as severe impairments at Step Two. (ECF Doc. 9-1, pp. 18-19.) She further argues that the ALJ failed to consider the effect of these disorders when formulating the RFC. (*Id*. at pp. 19-21.) The undersigned will address the two impairments in turn.

### 2. The ALJ Did Not Commit Harmful Error When She Failed to Designate a Psychotic Disorder as a Severe Impairment

Plaintiff argues that the ALJ erred at Step Two of the sequential analysis when she "d[id] not explain why Ms. Patterson's diagnosed schizophrenia/major depressive disorder with psychotic features did not constitute a severe impairment" and indeed "d[id] not even mention the fact that Ms. Patterson had been diagnosed with schizophrenia/a major depressive disorder with psychotic features." (ECF Doc. 9-1, p. 19.) Further, Plaintiff asserts that the ALJ erred at

Step Four when she "d[id] not explain why the well documented symptoms of paranoia and hallucinations, caused by Ms. Patterson's diagnosed schizophrenia/major depressive disorder with psychotic features, would not establish additional limitations upon Plaintiff's functional capacity." (*Id.*) The Commissioner responds that remand is not warranted because "the ALJ already found Plaintiff had several other severe mental impairments and the evidence supports the mental RFC regardless of whether the ALJ had identified another one." (ECF Doc. 10, p. 8.)

A review of the ALJ's decision reveals the flaws in Plaintiff's arguments. Beginning at Step Two, the ALJ found three mental impairments to be severe: major depressive disorder, generalized anxiety disorder, and post-traumatic stress disorder. (Tr. 625.) Considering the ALJ's designation of "major depressive disorder" as a severe impairment (*id.*), Ms. Patterson's assertion that the ALJ erred by not finding her "major depressive disorder *with psychotic features*" severe or by "not even mention[ing]" that diagnosis" (ECF Doc. 9-1, p. 19 (emphasis added)) appears to split hairs very finely. But even taking into account the limited treatment records that also record a diagnosis of "unspecified schizophrenia spectrum and other psychotic disorder" (*see, e.g.,* Tr. 1116), Sixth Circuit precedent indicates that the ALJ's failure to also designate a psychotic disorder as severe at Step Two is "legally irrelevant"—given the ALJ's identification of three other "severe" mental impairments—so long as the ALJ also considered the psychotic disorder, or the psychotic features of major depressive disorder, at "later steps" in the sequential analysis. *See Emard*, 953 F.3d at 852. Here, it is clear the ALJ did just that.

At Step Three, the ALJ found that "the severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.03, 12.04, 12.06, 12.08, and 12.15." (Tr. 629.) Listing 12.03 is the listing that pertains to "Schizophrenia spectrum and other psychotic disorders." 20 C.F.R. Pt. 404, Subpt. P, App. 1, §

12.03. In support of her finding that Ms. Patterson's mental impairments (considered singly and in combination) did not meet or equal any of the listings, the ALJ considered the relevant evidence and found Ms. Patterson had no more than moderate limitations in each of the four areas of mental functioning. (Tr. 629-30.) With respect to Ms. Patterson's ability to adapt and manage herself, the ALJ explained:

> As for adapting or managing oneself, the claimant has experienced a moderate limitation. In her Function Reports, the claimant said that she experiences anxiety, panic attacks, and post-traumatic stress disorder (PTSD) symptoms, and does not handle stress or changes in routine well []. The medical records show that in January 2023, the claimant called into crisis services for suicidal ideation []. She has also endorsed sadness, guilt, hopelessness, thoughts of death, low self-esteem, restlessness, sleeping too little, nervousness, hypervigilance, uneasiness, hallucinations, delusions, flashbacks, nightmares, and exaggerated startle response []. That said, the claimant did not receive regular mental health treatment during the relevant adjudicatory period; the periods of treatment were limited to January to March 2023 and January to February 2025 []. She also indicated that she is able to perform some self-care activities on her own []. Accordingly, I find the claimant has no more than a moderate limitation in adapting or managing oneself.

(Tr. 630 (emphasis added) (citations omitted).) Thus, at Step Three of the sequential analysis, the ALJ considered whether Ms. Patterson met or equaled the Listing pertaining to psychotic disorders (Tr. 629) and specifically accounted for how she had considered Ms. Patterson's reports of hallucinations and delusions in assessing her mental functioning (Tr. 630).

At Step Four, the ALJ considered Plaintiff's subjective complaints of "anxiety attacks, depression, and [PTSD]," but found that her statements regarding the intensity, persistence, and limiting effects of her symptoms were "not entirely consistent with the medical evidence and other evidence in the record."[5] (Tr. 632.) She then discussed Ms. Patterson's 2021 and 2023 psychological consultative examinations and "relatively limited specialized psychological or psychiatric treatment," including limited treatment between January and March 2023 and:

[5] Ms. Patterson did not allege disability due to a psychotic disorder in her 2021 or 2023 SSI applications (*see* Tr. 91, 100, 701, 717) and did not testify to any psychotic symptoms at her hearings (*see* Tr. 62-63, 667).

> More recently, in January 2025, the claimant established care at Signature Health for counseling to address depression, anxiety, and PTSD (B57F). The claimant endorsed sadness, guilt, hopelessness, thoughts of death, low self-esteem, sleeping too little, irritability, nervousness, hypervigilance, uneasiness, restlessness, racing thoughts, hallucinations, delusions, flashbacks, nightmares, and exaggerated startle response (Id.). The corresponding mental health assessment observed an appropriate appearance, good eye contact, unremarkable speech, unremarkable motor activity, full affect, euthymic mood, delusional thought content, hallucinations, alert attention, cooperative demeanor, appropriate insight, fair judgment (Id.). The claimant's diagnoses included MDD, GAD, and PTSD (Id.).

(Tr. 635 (emphasis added).) The ALJ also considered, and found "partially persuasive," the medical opinions of the state agency psychological consultants and consultative psychological examiners. (Tr. 638-40.) As to the 2023 state agency consultants, she acknowledged their reliance on "diagnoses of personality disorder and psychosis, PTSD, depression, and anxiety . . . and subjective reports of depression, vague psychotic symptoms, and suicidal ideation" before finding the opinions "somewhat consistent with the mental health treatment in the record," which included largely normal mental status exams and "only . . . approximately 6 months of specialized counseling services during the course of the entire relevant adjudicatory period." (Tr. 639 (emphasis added).) Thus, at Step Four, the ALJ acknowledged the treatment records and medical opinions that accounted for Ms. Patterson's alleged hallucinations and delusions but considered those records in the context of her largely normal mental status findings, limited mental health treatment, and reported activities of daily living before concluding that she had the RFC to perform work within specified mental limitations. (Tr. 631, 632, 635, 638-41.)

A review of the ALJ's complete written decision thus reveals that she considered Ms. Patterson's complaints of psychotic symptoms, including hallucinations and delusional thoughts (Tr. 630, 635, 639), but also considered her mental status findings (Tr. 635), her very limited mental health treatment (*id.*), and medical opinions finding she had at most mild-moderate limitations in the relevant areas of mental functioning (Tr. 638-40), before concluding that she

had moderate limitations in two areas of functioning and mild limitations in two others (Tr. 629-30) and adopting an RFC finding her able to complete work tasks with no production pace or hourly quotas in two-hour blocks, adapt to occasional changes in the work place, and interact with coworkers and supervisors on a limited basis (Tr. 631, 635). In this context, the Court finds the ALJ adequately considered all of Ms. Patterson's mental impairments at Steps Three and Four of the sequential analysis. Accordingly, the Court finds that "any perceived failure to find additional severe impairments at step two does not constitute reversible error." *Kestel*, 756 F. App'x at 597 (quoting *Fisk*, 253 F. App'x at 583 and *Maziarz*, 837 F.2d at 244) (internal quotation marks and alterations omitted).

For the reasons discussed above, the Court concludes that Plaintiff has not shown the ALJ's failure to designate a psychotic disorder as a "severe" impairment at Step Two amounted to harmful error, since the record demonstrates that the ALJ appropriately considered Plaintiff's reported hallucinations and delusions at Steps Three and Four of the sequential analysis.

**3. The ALJ Did Not Commit Harmful Error When She Found Plaintiff's Neurological Impairments Non-Severe at Step Two of the Sequential Analysis**

Plaintiff next argues that the ALJ erred "when she found that Ms. Patterson did not have any severe neurological impairments" at Step Two, and then "fail[ed] to account for the physical limitations from Ms. Patterson's neurological impairment" in the RFC at Step Four. (ECF Doc. 9-1, pp. 17.) Further, she argues that the ALJ mischaracterized the medical evidence when she said: "progress notes state that MRIs of the brain and cervical were unremarkable and did not show a lesion that should be responsible for the subjective complaints." (*Id.* at pp. 20-21 (quoting Tr. 627).) Contrary to the ALJ's finding, Ms. Patterson asserts that the results of the MRI imaging actually supported and led to "a diagnosis of multiple sclerosis." (*Id.*) The

Commissioner responds generally that the evidence supports the RFC as articulated, regardless of whether the ALJ designated a neurological disorder as severe. (ECF Doc. 10, pp. 8-9.)

The Court begins with a review of the neurology records, given Plaintiff's argument that the ALJ mischaracterized this evidence. Ms. Patterson complained of stinging, burning, and itching on her skin at an allergy visit on June 22, 2023. (Tr. 1270-72.) She was referred to neurology based on "suspicio[n] of a neuropathic process such as small fiber neuropathy." (Tr. 1272.) She then established care with CNP Hrestak in neurology on July 11, 2023 (Tr. 1245-52), continuing to complain of a painful, burning, itching sensation all over her skin, characterized as "paresthesia" (Tr. 1245, 1250). Her neurological examination findings were normal, except for hyperreflexia with positive clonus; she had no sensory deficits and no signs of neuropathy. (Tr. 1248-49, 1251.) CNP Hrestak ordered an "MRI of the brain and cervical spine to rule out an enhancing lesion," and labs and TILT testing to rule out dysautonomia. (Tr. 1251.) She listed the following diagnoses in connection with her orders for MRIs and other tests: paresthesia of skin; burning sensation of skin; and demyelinating disease of central nervous system. (*Id.*)

Ms. Patterson was scheduled for MRIs of the brain and cervical spine on August 8, 2023 (Tr. 1862-74), with a "visit diagnosis" of demyelinating disease of central nervous system (Tr. 1862, 1870) and a "suspected diagnosis" of demyelinating disease / multiple sclerosis (Tr. 1864). While Ms. Patterson says these MRIs were completed and "the medical professionals reviewing this imaging believed that the findings of the MRI warranted Ms. Patterson being diagnosed with multiple sclerosis" (ECF Doc. 9-1, pp. 20-21), the records contain no imaging findings (Tr. 1862-74) and other records from the same provider indicate the radiology appointments were cancelled due to an appointment conflict (Tr. 1338).[6] No cervical or brain MRI findings from

---

[6] The records also indicate Ms. Patterson attended an appointment with Dr. Purcell on that same date. (Tr. 1336-37.)

that (or any later) date have been identified by Plaintiff, and the Court is aware of none. Thus, Plaintiff's assertion that her MRI findings warranted an MS diagnosis lacks record support.

While the Court is unaware of actual MRI findings in the record, the notes for Plaintiff's neurology follow up with CNP Hrestak on October 28, 2024, fifteen months after her initial visit (Tr. 2088-94), indicate: "MRI brain and cervical spine were unremarkable and did not show a lesion that would be responsible for her subjective complaints."[7] (Tr. 2088; *see also* Tr. 2089.) Because Ms. Patterson continued to complain of burning, itching, and pain all over her body, CNP Hrestak recommended a skin biopsy "to rule out a small fiber neuropathy." (*Id.*) Plaintiff's neurologic examination was unremarkable. (Tr. 2092.) CNP Hrestak listed paresthesia of skin as the encounter diagnosis and ordered a skin biopsy for neuropathy. (Tr. 2088; *see* Tr. 2096.) The Court is not aware of any subsequent neurological testing or treatment.

Turning to Ms. Patterson's arguments that the ALJ erred at Step Two by not finding a "severe" neurological impairment and by mischaracterizing the records, the Court begins with the ALJ's Step Two findings. The ALJ provided the following explanation for her finding at Step Two that demyelinating disease of the central nervous system was non-severe:

> In addition to the severe medically determinable impairments listed above, the medical records also reference . . . urticaria, allergies, <u>demyelinating disease of central nervous system</u>, <u>paresthesia of the skin</u>, and arthritis, during the relevant adjudicatory period. <u>These impairments do not warrant full assessment herein because they do not limit the claimant's ability to perform basic work activities for a continuous period of 12 months or more. These impairments, considered singularly and together, have caused only transient or mild symptoms or associated limitations, were well-controlled with medication and medical treatments, have not met the 12-month durational requirement, or are otherwise not adequately supported by the medical evidence in the record.</u> Accordingly, these impairments do not constitute severe impairments.

[7] While CNP Hrestak describes the MRI findings (Tr. 2088, 2089), the radiology notes for this visit indicate "[n]o resulted procedures found" for the last two MRI Head/Brain, MRA Head and/or Neck, and MRI Spine (Tr. 2093).

> . . .
>
> The claimant sought treatment from a neurologist for tingling and numbness sensations in her body []. The neurologist included diagnoses of demyelinating disease of central nervous system and paresthesia of the skin []. However, progress notes state that MRIs of the brain and cervical spine were unremarkable and did not show a lesion that would be responsible for the subjective complaints []. Notably, in October 2024, the claimant admitted that her symptoms improve when she is calm and not anxious []. Thus, I find that . . . demyelinating disease of central nervous system, and paresthesia of the skin are non-severe impairments as they caused only transient or mild symptoms and associated limitations, were well-controlled with medication, and have not met the 12-month durational requirement.

(Tr. 625-27 (emphasis added) (citations omitted).) This explanation demonstrates that the ALJ offered clear reasoning for her conclusion that any neurological impairments associated with her claims of tingling and numbness in her body were non-severe. (Tr. 627.) The Court also sees no misrepresentations in the ALJ's description of the relevant records; rather, it is Plaintiff who mischaracterized the neurological findings, as discussed above.

While she found Ms. Patterson's neurological impairments non-severe at Step Two (Tr. 625-27), the ALJ found other physical impairments severe, including degenerative disc disease of the lumbar spine, obesity, asthma, and type 2 diabetes-mellitus (Tr. 625). The ALJ also explained that she had considered "all of the claimant's medically determinable impairments, including those that are nonsevere" in determining the RFC. (Tr. 628.) At Step Four, she considered Ms. Patterson's reported symptoms of pain, loss of grip strength, lightheadedness, skin itchiness, dizziness, and use of a cane for balance. (Tr. 632.) She also noted that: physical examinations regularly showed normal range of motion, normal gait and posture, normal strength in the lower extremities, and unremarkable sensory findings (Tr. 633); Ms. Patterson told providers her neurological symptoms improved when she was not anxious (Tr. 627); and she was able to engage in basic ADL's such as preparing food in the microwave and shopping in stores

(Tr. 632). The ALJ went on to explain that she included the following postural and environmental limitations in the RFC "to accommodate the claimant's physical impairments":

> I have limited her to light residual functional capacity with the following restrictions: can frequently balance, stoop, and climb ramps and stairs; can occasionally kneel, crouch, and crawl; can never climb ladders, ropes, or scaffolds; and should avoid frequent exposure to respiratory irritants and work tasks that require frequent exposure to work at unprotected heights.

(Tr. 634-35.)

Because the ALJ explained her basis for finding the neurological impairments non-severe (Tr. 627), considered all severe and non-severe impairments in assessing the RFC (Tr. 628, 631-35), and adopted an RFC with exertional, postural, and environmental limitations to account for all physical impairments (Tr. 631), the Court finds no reversible error in the ALJ's finding that demyelinating disease of central nervous system and paresthesia of the skin were non-severe.

Further, the court finds Ms. Patterson has not met her burden to show that the ALJ's RFC findings at Step Four lacked the support of substantial evidence. While Ms. Patterson argues that her treatment records support greater limitations than those found by the ALJ, "'[t]he substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakely*, 581 F.3d at 406 (internal citation omitted) (alteration in original). Ms. Patterson has not shown that the ALJ's consideration of the evidence fell outside the zone of choice afforded to the ALJ.

For the reasons set forth above, the Court concludes that Plaintiff has not demonstrated that the ALJ's designation of her neurological disorders as "non-severe" at Step Two amounted to harmful error, or that the ALJ's Step Four findings regarding her physical impairments otherwise lacked the support of substantial evidence.

Accordingly, the Court finds the first assignment of error lacks merit.

### C. Second Assignment of Error: Plaintiff Has Not Shown That the ALJ Erred in Evaluating the Treating Provider and Consultative Examiner Opinions

In her second assignment of error, Plaintiff argues that the ALJ erred by "minimizing" the medical opinions of her treating provider and the consultative psychological examiners and by not properly explaining why she found these opinions unpersuasive. (ECF Doc. 9-1, pp. 21-25.) The Commissioner responds that Plaintiff's arguments are conclusory, that the ALJ properly explained how she considered the medical opinion evidence, and that the ALJ's findings were supported by substantial evidence. (ECF Doc. 10, pp. 9-12.)

#### 1. Framework for Evaluation of Medical Opinion Evidence

Under applicable regulations, ALJs need "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a); *see Sallaz v. Comm'r of Soc. Sec.*, No. 23-3825, 2024 WL 2955645, at *5 (6th Cir. June 12, 2024) (quoting 20 C.F.R. § 404.1520c(a)). However, they must evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation. 20 C.F.R. § 404.1520c. Those five factors include supportability, consistency, relationship with the claimant, specialization, and other factors; but the most important factors are supportability and consistency. 20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2), 404.1520c(c)(1)-(5). ALJs must therefore explain how they considered supportability[8] and consistency[9] but need not explain how they considered other factors. 20 C.F.R. § 404.1520c(b)(2).

[8] "Supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in his or her opinion. *See* 20 C.F.R. § 404.1520c(c)(1).

[9] "Consistency" is the extent to which a medical source's opinion findings are consistent with the evidence from other medical and nonmedical sources in the record. *See* 20 C.F.R. § 404.1520c(c)(2).

In reviewing an ALJ's medical opinion analysis, courts must consider whether the ALJ: considered the full record in assessing the persuasiveness of the opinion; appropriately articulated his reasons for finding the opinion unpersuasive; and made findings supported by substantial evidence. *See* 20 C.F.R. § 416.920c (governing how ALJs consider and articulate findings re: medical opinions); 20 C.F.R. § 416.920(e) (findings re: RFCs will be "based on all the relevant medical and other evidence" in the case record); *see also Blakely*, 581 F.3d at 405.

Ms. Patterson challenges the ALJ's analysis of the medical opinions of treating provider Dr. Davis (Tr. 589-98, 2133-34) and consultative examiners Dr. Billman (Tr. 529-30) and Dr. Arnold (Tr. 1485-86). The Court will address the treating and consultative opinions in turn.

**2. The ALJ Adequately Evaluated the Treating Source Opinions of Dr. Davis**

Ms. Patterson describes Dr. Davis as a "long-term treating primary care provider" who supplied medical opinions "issued over several years" that were "consistent with one another" and the treatment records. (ECF Doc. 9-1, p. 22.) While she summarizes Dr. Davis's opinions (*id.* at pp. 22-23) and asserts that "virtually all of the medical professional's opinions were minimized" (*id.* at p. 21), she does not offer specific arguments as to how the ALJ erred in analyzing Dr. Davis's opinions. As the Commissioner observes, Ms. Patterson "does not really engage with the ALJ's analysis" and instead offers conclusory, underdeveloped arguments challenging the ALJ's findings. (ECF Doc. 10, pp. 10-11.)

With respect to Dr. Davis's 2021 and 2024 medical source statements, the ALJ explained that she found the opined limitations—including occasionally lifting ten pounds, standing or walking zero to two hours in an eight-hour workday, rarely stooping, crouching, kneeling, or crawling, and taking three hours of additional breaks (Tr. 637-38)—unpersuasive as follows

> I find Dr. Davis's opinions to be unpersuasive because they are overly restrictive and unsupported by the record. In terms of supportability, Dr. Davis referred to asthma, depression, anxiety, PTSD, poor vision and a glasses prescription, as well

> as the Functional Capacity Evaluation from June 2021 (discussed above) []. Regarding consistency, Dr. Davis's opinions are inconsistent with medical evidence of record which shows that although an x-ray revealed lumbar spondylosis and the claimant reported lower back pain and cane usage, physical exams often observed normal range of motion in the back, normal gait and posture, normal strength in the lower extremities, unremarkable sensory findings, and intact coordination []. The opinions are also inconsistent with the conservative treatment methodology used during the relevant adjudicatory period which lacked physical therapy, multiple injections, ablations, nerve blocks, or surgical procedures []. The opinions are also inconsistent with the evidence pertaining to asthma which shows that although spirometry testing noted obstruction, respiratory/lung examinations regularly observed normal respiratory effort and rate; normal, even and unlabored effort; clear to auscultation bilaterally; no wheezing, rales, or rhonchi; and symmetrical excursion []. They are also inconsistent with subjective reports of improvement in asthma after starting Dulera [].

(Tr. 638 (citations omitted) (emphasis added).) The ALJ also addressed letters that Dr. Davis wrote between 2018 and 2024, stating that Ms. Patterson was unable to work due to her chronic medical conditions, explaining:

> I did not provide articulation about the evidence that is inherently neither valuable nor persuasive in accordance with 20 CFR 404.1520b(c) and 20 CFR 416.920b(c) (B1F; B19F; B49F; B51F). I acknowledge the statements from Cherrica Davis, MD, that the claimant is unemployable due to chronic medical conditions (Id.). However, these letters do not qualify as medical opinions because they do not provide a statement about what the claimant can still do despite her impairments.

(Tr. 641 (citing Tr. 371, 1083-86, 2053-66, 2124).)

Beginning with the letters from 2018 through 2024, the Court finds the ALJ did not err in declining to address Dr. Davis's statements as to whether Ms. Patterson was "able to perform regular or continuing work," since the regulations establish that such findings are "reserved for the Commissioner." 20 C.F.R. § 416.920b(c)(3)(i). While Plaintiff admits that the statements "deal[] with the ultimate issue of disability, reserved for the ALJ," she asserts that the statements "cannot be simply cast aside." (ECF Doc. 9-1, p. 22.) On the contrary, the regulations clearly provide that the ALJ "will not provide any analysis" regarding such statements, which are "inherently neither valuable nor persuasive." 20 C.F.R. § 416.920b(c) (emphasis added).

Turning to the medical source statements, Ms. Patterson argues "[i]t is error when an ALJ fails to adequately explain how opinions were inconsistent or unsupported" (ECF Doc. 9-1, p. 22), but does not explain how the ALJ failed to address supportability or consistency. On the contrary, the decision reveals that the ALJ considered the extent to which Dr. Davis's opined limitations were supported by her references to asthma, depression, anxiety, PTSD, poor vision, a glasses prescription, and the 2021 functional capacity evaluation. (Tr. 638.) And she found the opinions inconsistent with the medical evidence (including lumbar x-rays, spirometry testing, and normal musculoskeletal and respiratory examination findings) and Ms. Patterson's conservative treatment and reported improvement with medication. (*Id.*) The Court finds the ALJ clearly explained her reasons for deeming the opinions unpersuasive, and Ms. Patterson has not met her burden to show that the findings lacked the support of substantial evidence.

Ms. Patterson's additional arguments that Dr. Davis's opinions "must be viewed as more valuable" than the opinions of the state agency medical consultants, and that "[t]he ALJ does not explain how the dated nature of [the state agency] findings, from 2021, effected persuasiveness" do not change this analysis. (ECF Doc. 9-1, pp. 24-25.) First, the regulations specify that the ALJ must "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . , including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a). Second, the ALJ explicitly found that the January 2021 and July 2021 opinions of state agency consultants Drs. Bolz and Siddiqui were "unpersuasive because [they] [were] not restrictive enough to accommodate the claimant's impairments." (Tr. 636.) Third, the ALJ also considered the September and December 2023 opinions of state agency medical consultants Drs. Hinzman and Torello—which are neither "dated" nor "from 2021"—and found them "largely

persuasive" based on an explanation that addressed both supportability and consistency.[10] (*Id.*) Thus, Plaintiff has identified nothing in the ALJ's analysis of the state agency medical opinions that undermines her findings regarding Dr. Davis's opinions.

As to Plaintiff's assertion that Dr. Davis's opinions should have been found persuasive because they "are consistent with one another, as well as the treatment records" (ECF Doc. 9-1, p. 22), this argument turns the relevant legal standard on its head. Even if a preponderance of the evidence supports a finding that Dr. Davis's opinions are persuasive, this Court cannot overturn the ALJ's finding to the contrary "so long as substantial evidence also support[ed] the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477; *Blakely*, 581 F.3d at 406.

For the reasons set forth above, the undersigned finds Ms. Patterson has not shown that the ALJ erred in assessing the persuasiveness of Dr. Davis's medical opinions and has not met her burden to show that the ALJ's findings lacked the support of substantial evidence.

### 3. The ALJ Adequately Evaluated the Medical Opinions of the Consultative Psychological Examiners

Ms. Patterson offers little developed argument in support of her challenge to the ALJ's analysis of the consultative psychological examiners' opinions, simply asserting that the ALJ "devalued and discounted each of the[] findings" in those opinions by concluding that they "were not supported by the medical evidence." (ECF Doc. 9-1, pp. 23-24.) Plaintiff also asserts that the consultative examiners' opinions "must be viewed as more valuable" than the opinions of the state agency psychological consultants, and that the ALJ did not "explain[] how the dated nature of [the state agency] findings, from 2021, effected persuasiveness." (*Id.* at 24-25.)

---

[10] Apparently missing the fact that the ALJ was separately addressing two sets of state agency opinions, one from 2021 and one from 2023, Ms. Patterson argues that the ALJ's conflicting findings regarding the persuasiveness of the 2021 and 2023 opinions created an "inconsistency lack[ing] the required coherent explanation of reasoning necessary to an ALJ decision." (ECF Doc. 9-1, p. 24.) This argument misunderstands the record and lacks merit.

Beginning with the latter arguments—that the state agency opinions were less valuable than the consultative examiner opinions, and that the ALJ failed to properly account for "the dated nature of the findings"—the Court finds those arguments lack merit for the same reasons discussed in Section IV.C.2., *supra*. Again, the regulations specify that the ALJ must "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . , including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a). And the ALJ did not only consider the persuasiveness of the state agency psychological opinions from January and July 2021, but also the opinions of state agency psychological consultants Drs. Lauer and Souder from September 2023 and January 2024. (Tr. 638-40.) The ALJ also addressed the supportability and consistency of each of the four opinions (*id.*) and considered the mental health treatment records that post-dated the opinions (Tr. 635). Thus, Plaintiff has identified nothing in the ALJ's analysis of the state agency psychological opinions that undermines her separate findings regarding the consultative psychological examiners' opinions.

Turning to Dr. Billman's opinion—which found Ms. Patterson had no limitations understanding, remembering and carrying out instructions, "may have some difficulties" maintaining attention, concentration, persistence, and pace, and had "significant limitations" responding appropriately to pressures, supervisors, and coworkers in a work setting (Tr. 529-30)—the ALJ explained her persuasiveness findings as follows:

> <u>I find Dr. Billman's opinion to be partially persuasive, although I find that the evidence supports a mild limitation in interacting with others, and a mild limitation in understanding, remembering, and applying information</u>. <u>In terms of supportability, Dr. Billman relied on his interview and mental status examination of the claimant</u> which observed adequate memory, an ability to track conversation relevantly, a lack of distraction by internal or external stimuli, a history of being fired and angering easily in job environments, and a history of trauma for which she has minimal ability to cope []. <u>Regarding consistency, Dr. Billman's opinion is somewhat consistent with the mental health treatment in the record.</u> Specifically, while the claimant endorsed symptoms of sadness, guilt, hopelessness, low self-

> esteem, irritability, hypervigilance, restlessness, racing thoughts, flashbacks, mental status exams observed appropriate hygiene, grooming, and appearance; cooperative attitude; good eye contact; normal speech; unremarkable motor activity; full affect; euthymic mood; unremarkable memory; unremarkable concentration; appropriate insight; and fair judgment []. However, the opinion is inconsistent with the subjective reports that the claimant socializes in person, on the phone, and via email, mail, text, and video chat []. It is also inconsistent with the statement in the December 2023 psychological consultative examiner report that, "The claimant reported no difficulty with social interactions in the past" and she has "a history of interacting well with co-workers and supervisors" []. Furthermore, Dr. Billman's opinion is somewhat consistent with the evidence that shows that claimant only engaged in approximately 6 months of specialized counseling services during the course of the entire relevant adjudicatory period [].

(Tr. 640 (citations omitted) (emphasis added).) Thus, the ALJ addressed the supportability and consistency of the opinion with reference to specific evidence (*id.*), following her earlier, more detailed discussion of Ms. Patterson's subjective complaints, reported ADL's, and psychological treatment records (Tr. 629-30, 632, 635). Ms. Patterson has not shown that the ALJ failed to adequately explain her findings regarding Dr. Billman's medical opinion, nor has she demonstrated that those findings lacked the support of substantial evidence.

As to Dr. Arnold's opinion—which found Ms. Patterson could understand, remember and carry out instructions, follow a conversation, think abstractly, sustain concentration and show persistence for an hour or more, and do some activities in a timely manner and at a reasonable pace (Tr. 1485-86)— the ALJ explained her persuasiveness findings as follows:

> To the extent that Dr. Arnold's statement qualifies as a medical opinion, I find it to be partially persuasive, although I find that the evidence supports a moderate limitation in concentration, persistence, and maintaining pace, and a mild limitation in understanding, remembering, or applying information. In terms of supportability, Dr. Arnold relied on her interview and mental status examination which revealed an ability to remember past events from her own life; an ability to recall 4 of 6 digits forward and 2 of 6 digits backward; an ability to immediately recall 3 of 3 words forward and 1 of 3 words after a few minutes; an ability to spell "world" both backward and forward and follow a three-step command; and an ability to follow conversation []. Regarding consistency, Dr. Arnold's opinion is somewhat consistent with the mental health treatment in the record. Specifically, while the claimant endorsed symptoms of sadness, guilt, hopelessness, low self-esteem,

> irritability, hypervigilance, restlessness, racing thoughts, flashbacks, mental status exams observed appropriate hygiene, grooming, and appearance; cooperative attitude; good eye contact; normal speech; unremarkable motor activity; full affect; euthymic mood; unremarkable memory; unremarkable concentration; appropriate insight; and fair judgment []. <u>Furthermore, the opinion is somewhat consistent with the evidence that shows that claimant only engaged in approximately 6 months of specialized counseling services during the course of the entire relevant adjudicatory period</u> [].

(Tr. 640-41 (citations omitted) (emphasis added).) Thus, the ALJ addressed the supportability and consistency of the opinion (*id.*), following her prior discussion of Ms. Patterson's subjective complaints, reported ADL's, and psychological treatment records (Tr. 629-30, 632, 635). Ms. Patterson has also failed to show that the ALJ did not adequately explain her findings as to Dr. Arnold, or that those findings lacked the support of substantial evidence.

For the reasons set forth above, the undersigned finds Ms. Patterson has failed to demonstrate that the ALJ erred in assessing the persuasiveness of the medical opinions of consultative psychological examiners Drs. Billman and Arnold, and has not met her burden to show that the ALJ's findings regarding those opinions lacked the support of substantial evidence.

Accordingly, the Court finds the second assignment of error lacks merit.

## V. Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's final decision.

September 18, 2026

*/s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge